**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION**

| | |
|---|---|
| KIMBERLY MEADOR, INDIVIDUALLY, AND AS GUARDIAN FOR L.M., A MINOR; AMOS STANDARD, INDIVIDUALLY, AND ON BEHALF OF THE ESTATE OF SHARI STANDARD, DECEASED; AND RUSSELL JONES, INDIVIDUALLY, AND ON BEHALF OF THE ESTATE OF SANDRA JONES, DECEASED. | |
| Plaintiffs, | |
| v. | Case No. 6:15-cv-715-MHS-KNM |
| APPLE, INC., | JURY TRIAL DEMANDED |
| Defendant. | |

**PLAINTIFFS' SECOND AMENDED COMPLAINT**

TO THE HONORABLE COURT:

Plaintiffs, KIMBERLY MEADOR, Individually, and as GUARDIAN FOR L.M., a minor child; AMOS STANDARD, Individually, and on behalf of THE ESTATE OF SHARI STANDARD, DECEASED; and RUSSELL JONES, Individually, and on behalf of the ESTATE OF SANDRA JONES, DECEASED, file this Second Amended Complaint against Defendant APPLE, INC., and in support thereof, respectfully show the court as follows:

**I.  PARTIES**

1.      Plaintiffs KIMBERLY MEADOR, Individually, and as GUARDIAN FOR L.M., a minor ("Meador"); AMOS STANDARD, Individually, and on behalf of THE ESTATE OF SHARI STANDARD, DECEASED ("Standard"); and RUSSELL JONES, Individually, and on behalf of

the ESTATE OF SANDRA JONES, DECEASED ("Jones") (collectively "Plaintiffs"), are individuals whose permanent addresses are in Henderson, Rusk County, Texas.

2.      Defendant APPLE, INC. ("Defendant" or "Apple") is a California corporation, with its principle place of business located at 1 Infinite Loop, M/S 38-3TX, Cupertino, CA 95014. Defendant is a non-resident California corporation, doing business in Texas.  Defendant may be served with process through its registered agent for service of process, CT Corporation System, 1999 Bryan St., Suite 900, Dallas, Texas 75201-3136.

## II.  JURISDICTION & VENUE

3.      The amount involved in this action is in excess of Seventy-Five Thousand Dollars ($75,000.00), exclusive of interest and costs.  This court has jurisdiction of this case by reason of the amount in controversy and by reason of a complete diversity of citizenship.

4.      Defendant has purposefully availed itself of the privileges and benefits of placing its services and goods into the stream of commerce in Texas and thereby conducts business in the State of Texas.

5.      The Court's exercise of personal jurisdiction over Defendant comports with due process.

6.      At all times material to the cause of action asserted herein, Defendant has had continuing and systematic contact with the State of Texas by delivering its goods to consumers, distributors, and retailers in Texas, including the Apple iPhone 5 ("iPhone").

7.      At all times material to the incident made the basis of this suit, Defendant was and continues to conduct business in and throughout the Eastern District of Texas, including the Tyler Division.

8.     The incident made the basis of this suit occurred in the Eastern District of Texas.

9.     Venue in this case is proper in the Eastern District of Texas, Tyler Division by virtue of Title 28 U.S.C. §1391 (b)(2).

### III.  FACTUAL BACKGROUND

**The Collision in Question**

10.     This suit arises out of a motor vehicle collision that occurred in Rusk County, Texas, on April 30, 2013.  At the time of the motor vehicle collision, L.M., a minor, was a passenger in a 2008 Chevrolet Tahoe driven by his grandmother, SANDRA JONES, traveling east on Highway 43 in Henderson, Rusk County, Texas.  SHARI STANDARD was also a passenger in the Tahoe driven by JONES.

11.     At the time of the collision, Ashley Kubiak ("Kubiak") was operating a 2003 Dodge Ram truck, traveling directly behind Plaintiffs, driving east on Highway 43 in Henderson, Rusk County, Texas.  The roadway Plaintiffs and Kubiak were travelling is straight and unobscured. *See Exhibit A – Photo of Roadway at scene of collision.*

12.     Based upon information and belief, immediately prior to the motor vehicle collision, Kubiak was operating the Dodge Ram truck and travelling at highway speed, while at the same time operating her iPhone.  Based on information and belief, as JONES slowed her Tahoe to turn left into her parents' neighborhood residence on County Road 214-D, Kubiak received a notification of an incoming message to her iPhone, and was distracted from the safe operation of her Ram pick-up truck, while reading an incoming message on her iPhone.  *See Exhibit B – Texas Department of Public Safety Offense Report.*   Based upon information and belief, when Kubiak looked up from her iPhone, she tried to avoid the collision by turning the wheel of her

Ram truck to the right, but could not avoid colliding with JONES's Tahoe due to the level of distraction caused by the iPhone.

13.     Kubiak's Ram truck struck the right rear portion of the Tahoe driven by JONES, pushing the Tahoe into the on-coming lane of traffic.  *See Exhibit C - Texas Department of Public Safety Crash Report.*  Immediately thereafter, JONES's Tahoe was struck broadside on the passenger side by a Ford F250 pickup truck.

14.     The collision between the Tahoe driven by JONES, and the Ford F250 was violent and caused extensive damage to the Tahoe.  *See Exhibit D – Post-Accident Photograph of Tahoe.*  As a proximate result of the collision, SANDRA JONES and SHARI STANDARD were pinned inside the Tahoe and died at the scene of the collision.  L.M. was transported via Life Flight to Children's Hospital in Dallas, Texas, where he was placed on life support and survived.

15.     At the time of the collision, L.M. was seven years old. Prior to the collision, L.M. had defeated child-hood leukemia. As a proximate result of the collision, L.M. was rendered paraplegic.

16.     On July 2, 2013, Kubiak was indicted on two counts of criminally negligent homicide, based on distracted driving through use of her iPhone.  *See Exhibits E1 & E2 – Certified Copies of Indictments.*  Following a jury trial, Kubiak was found guilty and convicted of two counts of criminally negligent homicide, based on distracted driving through the use of her iPhone.  *See Exhibits E3 & E4 – Certified Copies of Judgment & Sentence for Ashley Kubiak.*

**Distracted Driving**

17.     According to the National Highway Traffic Safety Administration ("NHTSA"), at any given daylight moment across America, approximately 660,000 drivers are using cell phones or manipulating electronic devices while driving.  *See Exhibit F –eWhat is Distracted Driving? Key Facts and Statistics.*  Engaging in visual-manual subtasks (such as reaching for a phone, dialing and texting) associated with the use of hand-held phones and other portable devices increases the risk of a crash by three times.  *Exhibit F.*  Because text messaging requires visual, manual and cognitive attention from the driver, it is by far the most alarming form of distracted driving.  Five seconds is the average time your eyes are off the road while texting.  When traveling at 55 mph, that is enough time to cover the length of a football field blindfolded.  *Id.*  In 2012, an estimated 421,000 people were injured in motor vehicle crashes involving a distracted driver.  This was a nine percent increase from the estimated 387,000 people injured in 2011.  *Id.*  Time distortion and dissociation occurs during use of smartphones, i.e. a user is not able to accurately perceive the amount of time it takes to pick up the phone, read it, and/or reply. This is especially dangerous during operation of a vehicle at highway speeds.

18.     Commentators and studies demonstrate that the level of impairment associated with the use of cell phones is as profound and dangerous as drunk driving. See "*Texting While Driving: The new Drunk Driving*," by Stephanie Hanes and Julie Masis, Christian Science Monitor, November 5, 2009; "*Texting While Driving: How Dangerous Is It?*" by Michael Austin, Car & Driver Magazine, June 2009; see also Strayer, Drwes and Crouch, *A Comparison of the Cell Phone Driver and the Drunk Driver*; Human Factors: The journal of the Human Factors and Ergonomics Society, Vol. 48, No. 2 (2006). On May 14, 2012, an independent survey conducted by a research firm for AT&T was publicized, demonstrating that virtually all teenagers agree that

texting while driving is dangerous, but nearly half admitted that they did it anyway.   Ninety-seven percent of the 1,200 teens surveyed said texting while driving was dangerous, and two-thirds acknowledged that it was very dangerous.  However, forty-three percent (43%) admitted to having texted or emailed while driving in the previous three months.  *See Exhibit G – "Despite Dangers U.S. Teens Text and Drive: Poll," Reuters.com, May 14, 2012.*  The survey showed that 89 percent (89%) of teens expect a reply to emails or text messages right away, or within five minutes.  *Exhibit G.*  In 2011, a survey relied upon by the United States Centers for Disease Control found that 31.2% of U.S. drivers aged 18-64 years had reported that they had read or sent text or email messages while driving at least once in the past 30 days prior to the survey. *Exhibit I – Mobile Device Use While Driving – United States and Seven European Countries, 2011.*  An anonymous survey reported in June 2012 found that nearly half of high school seniors admit they text or email while driving.  *Exhibit J – "CDC:  Nearly 60 Percent of Teens Text While Driving," NBCNews.com.*  In its *2012 Traffic Safety Culture Index* survey, the AAA Foundation for Traffic Safety found that over ninety-five percent of people surveyed believed texting or emailing and checking or updating social media behind the wheel to be serious threats to their personal safety while driving.  *AAA Foundation for Traffic Safety.  Distracted and Risk-Prone Drivers:  Select Findings from the 2012 Traffic Safety Culture Index.  January 2013.* Despite expressing strong disapproval of these behaviors, nearly twenty seven percent (27%) of the respondents reported typing or sending a text or email while driving at least once in the 30 days prior to the survey, and nearly thirty-five percent reported reading a text or email while driving during the same time frame.  *See Exhibit H – "Distracted Driving: Survey of the States, Governor's Highway Safety Association, July 2013, P. 7.*

19.     As of July 2013, forty-one states and the District of Columbia instituted bans on texting while driving, a forty-five percent (45%) increase in the number of states instituting texting while driving bans since 2010.  *See Exhibit H – P.3, Figure 1.*



Figure 1: **States That Ban Texting and Hand-Held Cell Phone Use**

However, Texas has no such ban.

**Apple's Contribution to Distracted Driving**

20.     As of July 2013, the U.S. wireless industry was valued at $195.5 billion, which is larger than publishing, agriculture, hotels, and lodging, air transportation, motion picture recording and motor vehicle manufacturing segments.  It rivals the computer system design service and oil and gas extraction industries.  *See Exhibit H – P. 2.*

21.     The first generation iPhone was released on June 29, 2007.  Thereafter, Apple released the iPhone 3G on July 11, 2008; the iPhone 3Gs on June 19, 2009; the iPhone 4 on June 24,

2010; the iPhone 4s on October 14, 2011;  the iPhone 5 on September 21, 2012; and the iPhone 5C and 5s on September 20, 2013.    In this time frame, nearly 500 million units were sold worldwide.    As of April 30, 2013, there were six generations of iPhone models, each release accompanied by one of five major releases of the iOS iPhone operating system.  The astounding volume of sales of the iPhone have been credited with reshaping the smartphone industry which made Apple one of the world's most valuable publicly traded companies in 2011-12.   In the fourth quarter of 2012, the iPhone 5 and iPhone 4s were the best-selling cell phones with sales of 27.4 million and 17.4 million units respectively.  From 2007 to 2011, Apple spent $647 million on advertising for the iPhone in the US.

22.    As of August 19, 2012, Apple's iPhone sales were worth more than all of Microsoft ("One Apple product, something that didn't exist five years ago, has higher sales than everything Microsoft has to offer.  More than Windows, Office, Xbox, Bing, Windows Phone, and every other product that Microsoft has created since 1975. In the quarter ended March 31, 2012, iPhone had sales of $22.7 billion; Microsoft as an entire company - $17.4 billion).  *Exhibit N – Apple's iPhone is Now Worth More than All of Microsoft, Forbes, August 19, 2012.*

23.    United States Patent 8,706,143 establishes that Apple invented the primary safer alternative design (i.e. the "lock-out" mechanism) in 2008, because it recognized the compulsory and dangerous nature of iPhone use by drivers, but failed to implement it in the iPhone 5. Paragraphs 28-31 below contain additional factual allegations about Apple's established knowledge of the risk, invention of a safer alternative design, and failure to implement. The invention claimed in the '143 patent predates the collision in question by over five years. The iPhone was defective because, at the time of the collision in question, no universal solution or

"built-in" method of disabling the sending or receiving of text messages, emails or notifications while driving was implemented by Apple for the iPhone.  Nevertheless, third-party software developers had developed some third-party applications for users to voluntarily install, after downloading (and in most instances, purchasing).

24.    Despite the high level of public awareness regarding the dangers of distracted driving when using an iPhone, and the compulsory nature of such use by drivers, Apple failed to implement a universal "built-in" solution which automatically "locks-out" the sending or receiving of text messages, emails, social media posts, messaging and/or notifications while driving.

## IV.  CAUSATION

**Derivative Liability**

25.    Kubiak's conduct (looking down to read a message delivered to her iPhone while traveling at highway speeds), is a derivative of Apple's conduct (failure to implement its own safer technology to prevent the delivery of messages and notifications of such messages to Kubiak's iPhone while travelling at highway speeds). "Cases of derivative liability involve wrongful conduct both by the person who is derivatively liable and the actor whose wrongful conduct was the direct cause of injury to another.  *See Fidelity & Guaranty Ins. Underwriters Inc. v. First Victoria Nat'l Bank,* 2006 U.S. Dist. LEXIS 23545, *19 (S.D. Texas 2006)(referencing William D. Underwood & Michael D. Morrison, *Apportioning Responsibility in Cases Involving Claims of Vicarious, Derivative, or Statutory Liability for Harm Directly Caused by the Conduct of Another,* 55 BAYLOR L. REV. 617, 647-48 (2003).  Based on information and belief, at the time of the collision in question, the iPhone utilized by Kubiak

contained the necessary hardware (to be configured with software) to automatically disable or "lock-out" the ability to send or receive texts, emails, social media posts and messaging. However, Apple failed to configure the iPhone to automatically "lock-out" the ability to send or receive texts, emails, social media posts, messaging and/or notifications while driving, despite having the technical capability to do so, and the knowledge that the use of the iPhone while driving at highway speeds created an unreasonable risk of harm to users and innocent bystanders. The conduct of Kubiak looking down to read a message delivered to her iPhone while traveling at highway speeds, is inextricably intertwined with the conduct of Apple wherein Apple, knowing the dangers involved with the use of the iPhone while driving: (a) designed an iPhone to alert Kubiak of incoming messages and/or provide said messages to Kubiak while driving at highway speeds; and (b) provided said iPhone to Kubiak without implementing its own technology to automatically disable or "lock-out" the ability to send or receive texts, emails, social media posts and messaging while driving at highway speeds.

**Smartphone Compulsion/Addiction, Notifications & Message Checking**

26.     On November 5, 2014, a survey commissioned by AT&T and conducted by Dr. David Greenfield, director of The Center for Internet and Technology Addiction was released.  The survey reported that there is near universal agreement that texting while driving is dangerous, yet three-fourths of drivers have texted while driving.  *Exhibit L – It Can Wait Compulsion Survey.* Greenfeld, an Associate Professor of Clinical Psychiatry at the University of Connecticut School of Medicine, refers to smartphones as "the world's smallest slot machines" because they affect the brain in similar ways that gambling or drugs can (dopamine levels increase as you anticipate messages, and that leads to higher levels of pleasure).  *Exhibit M – "Survey Finds People Text and Drive Knowing Dangers," El Paso Times, November 5, 2014.* An iPhone operates on a

Variable Ratio Schedule of Reinforcement, similar to a slot machine, and the user doesn't know whether the information will be satisfying or discomfiting. This triggers a second dopamine release. Therefore the user checks the smart phone over and over in an unconscious manner, i.e. compulsively.

27.     Dr. David Greenfield was retained by plaintiffs to provide conclusions and/or data based on studies performed by himself or his peers, to review the facts and/or data relevant to the collision, and render certain opinions based on reasonable probabilities in the fields of behavioral science and neurobiology, taking into account the facts of the motor vehicle collision sequence at issue.  Dr. Greenfield's summary opinions appear below:

> "**A.     I can state with a high degree of reasonable probability, that immediately before the motor vehicle crash in question, Ms. Kubiak was responding to an unconscious and automatic, neurobiological compulsion to engage in texting behavior while driving when she received a notification on her iPhone 5 and looked down to read a message on her iPhone 5 while driving at highway speeds.**
>
> **B.     It is highly likely, Ms. Kubiak was acting compulsively in response to an incoming notification - just as the majority of drivers admit to in my research as well as others'.  It is likely that such notifications activate the anticipatory reward pathways in the mesolimbic structures of the brain, which initiate the compulsive cascade of behavior that led to Ms. Kubiak to read a message on her iPhone 5 while driving at highway speeds.**
>
> **C.     It is reasonably probable that any electronic mechanism or device that blocks or prevents the provision of messaging notifications, and the ability to use distracting functions, such as the Messages application on the iPhone 5, should prevent or reduce the likelihood of texting behavior. There are numerous free-standing programs, applications and devices that do similar functions but these programs are severely limited in that they are controlled by the user/driver and can be turned off or eliminated if the driver**

so chose.  As I understand the safer alternative design proposed by the Plaintiffs in this case (i.e. Apple's '143 patent), if the safer alternative design would have been implemented by Apple, Kubiak likely would not have received notification of an incoming message, and likely would have not been compelled or able to engage in reading a message on her iPhone 5 while driving at highway speeds.

D.      It is my opinion that any native, device-based technology of some type (i.e. plaintiffs' safer alternative design or Apple's '143 patent) that could have been utilized but was not, has exacerbated the incidence of texting behavior while driving at highway speeds."

*Exhibit R – Declaration of David Greenfield, Ph.D., dated August 26, 2016.*  Exhibit R contains a detailed analysis of the smartphone compulsion/addiction studies in Dr. Greenfield's field of practice and study, as well as a detailed analysis related to the compulsion/addiction exhibited by Kubiak and her interaction with her iPhone 5, that likely led to the motor vehicle collision at issue.

## IV.  CAUSE OF ACTION I:  STRICT PRODUCTS LIABILITY

28.     Plaintiffs incorporate for all purposes, the preceding paragraphs of this complaint. Plaintiffs will show that the iPhone at issue, placed into the stream of commerce by Apple, was defectively designed, manufactured and marketed in such a defective condition that it was unreasonably dangerous within the meaning of Section 402(A) Restatement (Second) of Torts in the following particulars, including but not limited to:

a.  Failing to properly design the iPhone with a "lock-out" mechanism that is configured to "lock-out" the ability to send or receive texts, emails, social media posts, messaging and/or notifications while driving.

b.  Failing to properly design the iPhone with a "lock-out" mechanism that is configured to "lock-out" the ability to receive notifications of texts, emails, social media posts, messaging while driving.

c.  Failing to properly design the iPhone with a "lock-out" mechanism that is configured to "lock-out" the ability to utilize the iPhone to access and use applications that are unsafe to use while driving.

d.  Failing to provide a safer alternative design that would have prevented or significantly reduced the risk of Plaintiffs' injuries, without substantially impairing the utility of the iPhone.

e.  Failing to properly warn of the hazards and/or guard against the hazards associated with the use of the iPhone while driving.

f.  Such other acts or omissions that may be learned in discovery or at trial.

**Apple's Safer Alternative Design**

29.     Apple has known since 2008 of the dangers of operating an iPhone while driving. Specifically, on December 12, 2008, Apple filed a patent application with the United States Patent Office entitled:  "Driver Handheld Computing Device Lock-Out." *See Exhibit O – United States Patent No., 8,706,143.*   The patented technology provides "a lock-out mechanism to prevent operation of one or more functions of handheld computing devices by drivers when operating vehicles" *Exhibit O – Col. 1, L 7-10.*   The background of the invention goes on to state that:  "Texting while driving has become a major concern of parents, law enforcement, and the general public." Figure 1 of the '143 Patent identifies the unsafe operating area of a vehicle to utilize a hand-held computing device:



30.     Apple understood that reliance upon iPhone users to voluntarily refrain from use of the iPhone while driving was insufficient to address the problem:  "Teens understand that texting while driving is dangerous, but this is often not enough motivation to end the practice."  Apple even had awareness that laws enacted to stop iPhone use while driving were not enough to solve the problem:  "law enforcement officials report that their ability to catch offenders is limited because the texting device can be used out of sight (e.g. on the driver's lap), thus making texting while driving even more dangerous." *Id. at Col. 1, L 26-29.*  The most startling knowledge

maintained by Apple:  "Texting while driving has become so widespread it is doubtful that law enforcement will have any significant effect on stopping the practice." *Id. at Col. 1, L 29-32.*

31.     The '143 Patent provides various examples to prevent iPhone use by drivers, but the most logical embodiment consists of a "lock-out mechanism configured to disable" one or more iPhone functions when "the output of the motion analyzer indicates" that the iPhone is "in motion beyond a predetermined threshold level (e.g. speed)." *Id. at Col. 3, L 41-45.*  On information and belief, the iPhone 5 was sold and distributed with GPS and accelerometer capability.  Yet Apple failed to configure the iPhone to "lock-out" the ability to send or receive texts, emails, social media posts and messaging while driving at a certain speed.  Once the predetermined speed threshold is reached, and "lock out engaged," the same embodiment describes a "scenery analyzer" that "can be configured to determine whether a holder of a handheld computing device is located within safe operating area of vehicle." *Id. at Col. 3, L 33-35.*  "The lock out mechanism can be configured to disable one or more functions" of an iPhone 5 "based on the output of the motion analyzer, and enable the one or more functions" of an iPhone 5 "based on the output of the scenery analyzer." *Id. at Col. 3, L 35-40.*  According to Apple, "this can enables (sic) passengers in moving vehicles to operate handheld computing device without one or more of its functions being disabled." *Id. at Col. 3, L 52-55.*  Plaintiff's allege that the embodiment described above, as well as those described in the '143 patent constitute safer alternative designs.  In addition, Claim 1 of Apple's '143 patent, constitutes a safer alternative design. *Id. at Col. 7, L 13-25.*  The embodiments described and Claim 1 of the '143 patent could have been configured by Apple (but encrypted to prevent modification by the user) through

programming to allow or not allow certain applications deemed to be unsafe, or applications deemed to be necessary for the utility of the iPhone 5.   As the '143 Patent states:   "Although embodiments of this invention have been fully described with reference to the accompanying drawings, it is to be noted that various changes and modification will become apparent to those skilled in the art. Such changes and modifications are to be understood as being included within the scope of embodiments of this invention as defined by the appended claims."  *Id., at Col. 7, L 6-12.*

32.     In addition to Apple's safer alternative design in the form of the '143 patent, Plaintiffs propose an alternative design based on the native applications of the iPhone that Apple has deemed safe to use while driving and has implemented in its CarPlay product.  *See Exhibit P, Apple CarPlay Advertisement.* This safer alternative design was capable of implementation since at least 2011, and does not require any additional device installation in a vehicle, merely modification of the programming of the existing iPhone software in conjunction with its existing hardware.  Apple has deemed these native applications (and the present iteration of CarPlay) a safer way to utilize the applications that consumers want ("CarPlay has been designed from the ground up to be a safe, smart solution that optimizes the in-car experience while minimizing driver distraction.") *See Exhibit P.*   A general description of this safer alternative design is as follows:

i.     A motion analyzer determines if the iPhone 5 is travelling at a predetermined speed threshold;

ii.    If predetermined speed threshold is met, the iPhone 5's "Do Not Disturb" function engages – ceasing all notifications other than calls to the iPhone – and a "lock-out" is configured to perform the following:

       a.   Keyboard entry for functions other than calling are disabled;

       b.   Messaging based applications (text, messages, email, Snapchat, Messenger, etc) are disabled;

       c.   Siri Input/Output only, allowed for applications deemed to be safe for CarPlay, except for Messages and Calendar, which are disabled;

       d.   All icons for applications which are disabled, dark and will not open;

   iii.   Once travelling speed is reduced below predetermined speed threshold, for a period of time, "lock-out" and "Do Not Disturb" are disengaged.

33.     A visual representation of this safer alternative design is attached hereto. *See Exhibit Q, Plaintiffs Safer Alternative Design.* This safer alternative design could have been easily modified by Apple (but encrypted to prevent modification by the user) through programming to allow or not allow certain applications deemed to be unsafe, or applications deemed to be necessary for the utility of the iPhone 5.

34.     The '143 Patent and Plaintiffs' proposed alternative design provide safer alternative designs that would have, in all reasonable probability prevented or significantly reduced the risk of the occurrence in question without substantially impairing the iPhone's utility; and was economically and technologically feasible at the time the iPhone 5 left the control of Apple by the application of existing or reasonably achievable scientific knowledge.

35.     The foregoing acts of omission or commission on the part of Apple were a producing cause of the injuries and damages suffered by Plaintiffs in that Apple's conduct was a substantial factor in bringing about the injuries suffered, and without which the injuries would not have occurred.

## V.  CAUSE OF ACTION II:  NEGLIGENCE

36.     Plaintiffs incorporate by reference the foregoing paragraphs of this complaint.

37.     Apple owed a legal duty to Plaintiffs.  Specifically, Apple owed a duty to take affirmative action to control or avoid increasing the danger from a foreseeable risk of harm that had been created by Apple's conduct.  Based on the foregoing:

a)  it was entirely foreseeable to Apple that users would be compelled to check and/or read messages on the iPhone 5, once notified of an incoming message by their iPhone 5;

b)   It was entirely foreseeable to Apple that users will utilize the iPhone while driving through either sending or receiving texts, emails, social media posts and/or messaging while driving.

c)  It was entirely foreseeable to Apple that users utilizing the iPhone while driving through either sending or receiving texts, emails, social media posts, messaging and/or notifications would pose an unreasonable risk of harm to themselves and other drivers on the roadway.

38.     Furthermore, Apple owed a duty to use reasonable care in the design of the iPhone. Apple breached its duty to Plaintiffs by:

a.  Failing to properly design the iPhone with a "lock-out" mechanism that is configured to "lock-out" the ability to send or receive texts, emails, social media posts, messaging and/or notifications while driving.

b.  Failing to properly design the iPhone with a "lock-out" mechanism that is configured to "lock-out" the ability to receive notifications of texts, emails, social media posts, messaging while driving.

c.  Failing to properly design the iPhone with a "lock-out" mechanism that is configured to "lock-out" the ability to utilize the iPhone to access and use applications that are unsafe to use while driving.

d. Failing to provide a safer alternative design that would have prevented or significantly reduced the risk of Plaintiffs' injuries, without substantially impairing the utility of the iPhone.

e. Failing to properly warn of the hazards and/or guard against the hazards associated with the use of the iPhone while driving.

f. Such other acts or omissions that may be learned in discovery or at trial.

39. Apple's breach of duty proximately caused injury to the plaintiffs, which resulted in damages, the specifics of which are discussed in more detail below.

## VI. WRONGFUL DEATH ACT

40. AMOS STANDARD, and RUSSELL JONES, file this cause of action pursuant to Tex. Civ. Prac. & Rem. Code § 71.001 et. seq. ("The Wrongful Death Act"). As such, STANDARD and JONES are the proper parties to bring this action, and bring suit for all allowable damages under the Wrongful Death Act.

## VII. SURVIVAL ACTION

41. AMOS STANDARD, on behalf of THE ESTATE OF SHARI STANDARD, DECEASED, is the proper party to represent SHARI STANDARD in her claims for funeral expenses, and for the physical pain and mental anguish suffered by SHARI STANDARD prior to her death. RUSSELL JONES, on behalf of the ESTATE OF SANDRA JONES, DECEASED, is the proper party to represent SANDRA JONES in her claims for funeral expenses, and for the physical pain and mental anguish suffered by SANDRA JONES prior to her death.

## VIII. DAMAGES

42. As a result of the incident made the basis of this suit, KIMBERLY MEADOR, Individually, and as GUARDIAN FOR L.M., a minor child, has sustained injuries and seeks the following damages:

    a.  Medical expenses in the past and future;

    b.  Physical impairment in the past and future;

    c.  Pain and suffering in the past and future;

    d.  Disfigurement in the past and future;

    e.  Mental anguish in the past and future;

    f.  Loss of earning capacity; and

    g.  All other relief, in law and in equity, to which this Plaintiff may be entitled.

43.    As a result of the incident made the basis of this suit, AMOS STANDARD, Individually, and on behalf of THE ESTATE OF SHARI STANDARD, DECEASED; and RUSSELL JONES, Individually, and on behalf of the ESTATE OF SANDRA JONES, DECEASED, have sustained injuries and seek the following damages:

    a.  pecuniary loss sustained by Plaintiffs in the past and that Plaintiffs will suffer in the future;

    b.  loss of society and companionship that Plaintiffs have suffered in the past and will suffer in the future;

    c.  mental anguish that Plaintiffs have suffered in the past and will suffer in the future because of the death of their loved one;

    d.  support that the Decedents would have provided Plaintiffs in the past and would have provided in the future;

    e.  loss of care, counsel, nurture, attention, guidance, and protection that the Decedents would have provided in the past and would have provided in the future;

    f.  loss of services that the Decedents were accustomed to performing about the family home in the past and would have performed in the future;

    g.  loss of inheritance as a result of the death of the Decedents, from the time of the incident to the time of trial;

    h.  loss of inheritance as a result of the death of the Decedent, in the future beyond the time of trial which would have been accumulated for the benefit of Plaintiffs if the Decedents had not died prematurely;

i.  conscious physical pain and suffering, mental anguish, suffered by the Decedents prior to death;

j.  funeral and burial expenses of Decedents; and

k.  all other elements of damage to which Plaintiffs may show themselves to be entitled to under the law.

## IX.  EXEMPLARY DAMAGES

44.     Plaintiffs incorporate by reference all of the foregoing paragraphs of their complaint. Plaintiffs seek exemplary damages from Apple as it acted with gross negligence as described above, such gross negligence being the producing cause of injury to plaintiffs and the damages identified herein.

## X.  JURY DEMAND

45.     Plaintiffs demand a trial by jury on all issues and claims so triable.

## XI.  STATUTE OF LIMITATIONS

46.     Pursuant to a valid and enforceable tolling agreement between the parties, Plaintiffs filed this suit within the applicable statute of limitations period.

## PRAYER

For the reasons cited herein, Plaintiffs ask the Court to issue citation for Defendant to appear and answer, and that Plaintiffs be awarded a judgment against Defendant for the following:

a.  actual damages;

b.  exemplary damages;

c.  pre-judgment and post-judgment interest;

d.  court costs; and

e.  all other relief to which Plaintiffs are entitled.

Dated:  August 30, 2016.                              Respectfully submitted,


                                                     /s/ *Gregory P. Love*
                                                     Gregory P. Love
                                                     Texas Bar No. 24013060
                                                     Love Law Firm, P.C.
                                                     P. O. Box 948
                                                     Henderson, Texas 75653-0948
                                                     903/690-7100
                                                     903/392-2267 (Fax)
                                                     greg@lovetrialfirm.com

                                                     Ron Adkison
                                                     Texas Bar No. 00921090
                                                     Adkison Law Firm
                                                     300 West Main Street
                                                     Henderson, Texas 75652
                                                     903/657-8454
                                                     903/657-6108 (Fax)

                                                     John F. (Jack) Walker, III
                                                     State Bar No. 00785167
                                                     Marisa Schouten
                                                     State Bar No. 24039163
                                                     Martin Walker, PC
                                                     121 N. Spring Ave.
                                                     Tyler, TX 75702
                                                     903-521-1600
                                                     903-595-0796 (Fax)
                                                     jwalker@martinwalkerlaw.com

                                             **COUNSEL FOR PLAINTIFFS**


                              <u>**CERTIFICATE OF SERVICE**</u>

        I hereby certify that on this the 30th day of August, 2016, I electronically filed the
foregoing with the Clerk of Court using the CM/ECF system which will send notification of such
filing to each counsel of record listed below.  To the extent any such counsel is not registered for
such electronic delivery, the foregoing document will be served in accordance with the Federal
Rules of Civil Procedure.


                                                      /s/ *Gregory P. Love*
                                                     Gregory P. Love